Donald P. DOTY, et al., Respondents,

v.

F. Rudi BRUECKNER, et al., Appellants.

No. C8-84-319.

Court of Appeals of Minnesota.

Aug. 14, 1984.

Marvin A. Holt, Edina, for respondents.

Carl F. Dever, Hopkins, for appellants.

Heard, considered and decided by LANS-ING, P.J., and WOZNIAK and FORS-BERG, JJ.

## OPINION

LANSING, Judge.

This appeal arises out of a dispute between the buyer and seller of a lot over representations made at the time of sale. The trial judge heard evidence and ordered judgment for the plaintiffs for $6,043.17. On appeal, appellant sellers contend that the evidence is insufficient to sustain a judgment of fraud because (1) there is a conflict in the evidence as to whether any misrepresentation was made; and (2) the alleged misrepresentation did not proximately cause the damage. We affirm in part, reverse in part, and remand with instructions to modify the judgment.

## ISSUES

1. Is the evidence sufficient to sustain the trial court's finding that a misrepresentation was made?

2. Is the evidence sufficient to sustain the finding that the misrepresentation proximately caused all the damage?

## FACTS

In June 1981 the Dotys saw a newspaper ad offering a lot for sale at 10315 Lakeview Drive in Minnetonka. The Dotys were looking for a flat lot, perferably in a marshy, natural area, on which to build a home with a full basement and walkout (sliding glass door from the basement into the backyard).

They called the Brueckners and arranged to look at the lot. The Brueckners' home is adjacent to the lot in question. The Brueckners have owned the property since May 1980. When the Dotys looked at it, the lot was densely covered with waist-high grass, weeds, and young trees. They could only walk about 15 feet into it because of the ground cover. The lot was close to Windsor Lake, and there was a marshy area across the road to the west. The lot already had sewer and water connections.

Mr. Doty noticed that the lot was bordered by a drainage ditch and that the ground seemed to plateau above it. He testified that he asked Mr. Brueckner whether there was any fill on the lot, and Brueckner replied, "Well, probably just a foot or so, just to bring it up to road level." Doty also testified that he told Brueckner what type of house they were planning to build, and Brueckner replied, "Oh, yeah, this is a good lot for that." Brueckner gave Doty a survey certificate that showed where Russell Aiken, a prior owner, had planned to build a house and suggested that Doty contact him for more information about the lot's suitability. Brueckner told

him that the water table was at about "934 or 936 elevation," but Doty was not familiar with the term and did not realize its significance.

The Dotys agreed to pay the asking price of $19,000. A short time later, Doty talked to Virgil Herman, a city engineer for Minnetonka. Doty asked if the lot was considered wetland, and Herman said no, so Doty thought he "could go ahead and pursue the property." A contract for deed was signed on August 3, and Doty took out a building permit and started work later that month. Doty acted as the general contractor. Although he worked for his brother's construction company, his job was in sales, and this was the first actual construction job he had performed. In order to get the building permit he had the lot surveyed, and the surveyor noted that the minimum basement elevation was 934 (the elevation of the lot's surface varied from about 934 to 937 feet above sea level). The city engineer increased the minimum elevation to 937 to guard against fluctuations in the water table.

During the excavation process, Doty discovered about five feet of fill in the excavation area, composed of clay, cement blocks, and chunks of tar. Water also began seeping into the hole. A city building inspector refused to approve the footings and told Doty that soil tests were necessary.

The soil engineer who performed the tests testified that the excavation area contained four to five feet of fill and that beneath the fill was natural soil and gray silty clay "typical of marsh environments." To make the site buildable, both the fill and the soft silty clay had to be removed and replaced with eight to ten feet of compacted sand. Doty had this done, and most of the damages awarded at trial are for this cost. Fill was also required to cover the foundation after raising the level of the basement almost to the surface of the lot.

Gary Aiken, a neighbor who lives to the north, also testified at trial. His father, Russell, had originally owned and subdivided the lots in that area. Aiken said that he had had several conversations with Brueck-

ner before the sale to the Dotys. Brueckner repeatedly asked him whether the lot was buildable. Aiken told Brueckner that his father tried to build on the lot at one time. He had excavated the site later used by the Dotys but gave up when the hole kept filling with water. In 1974 or 1975 he used fill provided by the city to fill the excavation hole. Brueckner specifically asked how much fill there was, and Aiken told him four to five feet. Aiken recommended that Brueckner obtain a soil test to determine whether the lot was buildable.

Brueckner testified that he told Doty about the fill but did not say how deep it was. He said he gave the survey certificate for Russell Aiken's house to Doty and suggested calling Aiken for more information. Brueckner does not recall discussing the type of house the Dotys planned to build and denies saying that the lot was "good" for any particular design. He did not fill the lot or have soil tests done while he owned it.

The trial court found that Brueckner had misrepresented the amount of fill to the Dotys and thereby induced them to purchase the lot. The court awarded damages for removal of the fill and the soft, silty clay and for replacement with compacted sand. The damages also included soil test expenses and storage costs caused by the subsequent delay in construction. In a memorandum the judge said that Brueckner had not misrepresented the water level of the lot, so the Dotys should carry the costs attributable to raising the level of the house.

## ANALYSIS

### I

■ Brueckner argues that the evidence is insufficient to sustain the trial court's finding that a misrepresentation was made because there was no corroboration of his alleged statement to Doty that there was only one foot of fill. He further argues that because he had told Doty about the water level, he was not likely to lie about the fill. Brueckner then attempts to im-

peach Doty's testimony by arguing that his memory was not accurate as to the number of times he saw the lot before signing the purchase agreement.

These arguments are not persuasive. The trial court viewed the witnesses and assessed their credibility. There is adequate evidence in the record to support the trial court's finding that Brueckner knowingly misrepresented the amount of fill. That finding is not clearly erroneous and will not be disturbed on appeal. *See Strouth v. Wilkison*, 302 Minn. 297, 299, 224 N.W.2d 511, 513–14 (1974) (citing *Davis v. Re-trac Mfg. Corp.*, 276 Minn. 116, 149 N.W.2d 37 (1967)).

## II

■ Brueckner also argues that the evidence is insufficient to sustain the finding that the misrepresentation proximately caused the damages. Proximate cause is an element of a fraud action. *See Davis v. Re-trac Mfg. Corp.*, 276 Minn. at 117, 149 N.W.2d at 39. Appellant argues that the misrepresentation did not cause the damage because the problem with the lot was the marshy soil beneath the fill, not the fill alone. According to the soil engineer, both the fill and four to five feet of the underlying soil had to be removed and replaced with compacted sand.

■ The record shows that about half the cost of excavating and replacing soil was for the fill and about half was for the underlying marsh. The question is whether the misrepresentations proximately caused *all* the damage.

Prosser uses the following examples to illustrate proximate cause in misrepresentation cases:

In general * * * the courts have restricted recovery to those damages which might foreseeably be expected to follow from the character of the misrepresentation itself. Thus if the plaintiff stores his goods in a warehouse represented to him to be fireproof, and they are destroyed when it burns down, he can recover * * *. But if false statements are made in connection with the sale of cor-

porate stock, losses due to a subsequent decline of the market, or insolvency of the corporation, brought about by business conditions or other factors in no way related to the representations, will not afford any basis for recovery.

W. Prosser, *Handbook of the Law of Torts,* § 110, at 732 (4th ed. 1971) (footnotes omitted).

There is no evidence in the record that the soil problems could foreseeably be expected to follow from the misrepresentation about the amount of fill. In fact, the soil problems relate to the water level of the lot, which the trial court found Brueckner did not misrepresent. He made no representations about the soil, and he advised the Dotys to contact Russell Aiken to find out more about the soil. They apparently chose not to do so.

Under these circumstances, the trial court's finding that all the damages were attributable to Brueckner's misrepresentations was clearly erroneous. The soil engineer testified that equal amounts of fill and marsh had to be removed and replaced. Therefore, those expenses should be shared equally by the Dotys and the Brueckners. Furthermore, the soil test would have been necessary even if there had been no fill on the lot.

## DECISION

This court may modify a judgment in the interests of justice. Minn.R.Civ.App.P. 103.04. After subtracting the cost of the soil test and dividing the remaining expenses in half, the damage figure for the Dotys is $2,610.49. We therefore modify the Dotys' judgment to $2,610.49 and remand with instructions to enter judgment in accordance with this opinion.

**Affirmed in part, reversed in part, and remanded.**